■ In the Matter of S. S. & K. REALTY CORP., Respondent, v FINANCE ADMINISTRATION OF THE CITY OF NEW YORK et al., Appellants. — In a proceeding pursuant to article 7 of the Real Property Tax Law to review assessments (for purposes of taxation) made on certain real property for the tax years 1974/1975 through 1978/1979, inclusive, the appeal is from a judgment of the Supreme Court, Queens County (Kassoff, J.), dated September 4, 1979, which reduced the total assessment for each year. Judgment reversed, on the law, with costs, and new trial granted in accordance herewith. The subject site is improved with a five-story home for adults, known as the Far Rockaway Manor Home for Adults. On November 15, 1972 a building loan mortgage was recorded between petitioner S. S. & K. Realty Corp. and the National Bank of North America for $3,136,500. On November 22, 1976 petitioner secured from the Manhattan Savings Bank an additional mortgage of $1,063,500. The National Bank of North America mortgage was then assigned to the Manhattan Savings Bank for a total first mortgage of $4,200,000. By April 15, 1974 the structure had been completed and was ready for occupancy. The assessed valuations in issue are:

| Year | Land | Building | Total |
|------|------|----------|-------|
| 1974/1975 | $166,000 | $1,290,000 | $1,456,000 |
| 1975/1976 | 205,000 | 1,470,000 | 1,675,000 |
| 1976/1977 | 205,000 | 1,470,000 | 1,675,000 |
| 1977/1978 | 205,000 | 1,470,000 | 1,675,000 |
| 1978/1979 | 205,000 | 1,470,000 | 1,675,000 |

The petitioner commenced the instant proceeding to review the assessments. A trial was held on October 5, 1978. Prior to the commencement of the trial the attorneys then representing petitioner obtained two letters from the general contractor (Arara Construction Corp.). The first letter (dated Feb. 13, 1975) advised that "the construction cost [for the subject permises] amounted to $667,835.00". The letter provided no breakdown. The second letter, however (dated March 14, 1975), set forth a "trade breakdown" totaling $678,574. The breakdown contained categories such as "Excavation", "Concrete", "Masonry", and "Steel". These letters were annexed as an addendum to the written appraisal of petitioner's real estate expert Sidney Panzer. There was no evidence that he is an architect, engineer, builder or attorney. In that report Panzer stated that he has "adopted the acquisition cost of the land, $235,000, being aware that it is higher than the land assessment." Panzer's report then stated: "In my opinion, the economic approach to value is not viable for these premises because I know of no leases of a similar property which represents the rental value of the real estate alone as opposed to the equipment and the

business. For this reason and in view of the fact that the building was constructed just prior to the first year under review, I have adopted the actual cost of construction in the amount of $678,574, broken down as follows". The breakdown was a duplication of the general contractor's letter of March 14, 1975. Panzer stated in his report that: "I have confirmed such figures with Arara Construction Corp., the general contractor, Irwin Steinhauser and Nat Rosenwasser, the principals, and Hines, Waters, Zurkow & Klein, the attorneys at the time for the petitioner. I have added such actual construction cost to my land value, which represents the actual acquisition cost of the land." Panzer's report concluded that the fair market value at the times in issue was:

| "Year | Land | Building | Total |
|---|---|---|---|
| "1974/75 | $235,000 | $680,000 | $915,000 |
| "1975/76 | 235,000 | 680,000 | 915,000 |
| "1976/77 | 235,000 | 680,000 | 915,000 |
| "1977/78 | 235,000 | 680,000 | 915,000 |
| "1978/79 | 235,000 | 680,000 | 915,000". |

At the trial, petitioner's president, Irwin Steinhauser (not shown to be an architect, engineer, builder or lawyer), testified that the amount stated in the general contractor's letter of March 14, 1975 ($678,574) was in fact paid by petitioner to the general contractor. Steinhauser testified that this was the amount which *paid for* the total construction of the property; it was the *total cost* of the construction of the property, exclusive of furniture, carpeting, lighting fixtures, kitchen equipment and such other similar equipment which the State required petitioner to provide to conform to the State code; that this sum ($678,574) represents the cost to construct the building, "just the bare construction" of the building itself. He conceded (on cross-examination) that the cost of landscaping and painting was omitted but claimed that these were the only items missing from the list. However, petitioner had placed in evidence its applications for correction of the assessed valuations. Annexed to the applications for the year 1977-1978 were petitioner's tax returns for the tax years 1973 and 1974. The returns contained balance sheets. The asset schedules therein revealed the following valuations:

1973 Return:

| | "Beginning of taxable year | | End of taxable year | |
|---|---|---|---|---|
| | (A) Amount | (B) Total | (C) Amount | (D) Total |
| | *** | *** | *** | *** |
| "Buildings and other fixed depreciable assets | 399,763 | | 2,512,660 | |
| "Less accumulated depreciation | 0 | 399,763 | 0 | 2,512,660". |

1974 Return:

| | "Beginning of Taxable Year | | End of taxable year | |
|---|---|---|---|---|
| | (A) Amount | (B) Total | (C) Amount | (D) Total |
| | *** | *** | *** | *** |
| "Buildings and other fixed depreciable assets | $2,512,660 | | 2,540,335 | |
| "Less accumulated depreciation | 0 | 2,512,660 | 33,482 | 2,506,853". |

When the above valuations were called to the attention of petitioner's president (on cross-examination), he "explained" that these valuations included "many" items *other* than the building itself: that the "Buildings and other fixed depreciable .assets" classification included such items as kitchen equipment, air conditioning, etc. "[W]e spent close to $2,000,000 just on the other items". However, a handwritten schedule attached to petitioner's application for an extension of time to file the tax return for the fiscal year commencing July 1, 1974, stated in part:

| "Depreciation | Date Acquired | Cost | Depreciation Allowed | Method | Rate | Depreci- ation |
|---|---|---|---|---|---|---|
| "Building | 1974 | $2,533,056 | 0 | 2-½% | SL (½) | 31,663 |
| "Auto | 1974 | 7,279 | 0 | 25% | SL | 1,819 |
| "Total | | $2,540,335 | | | | 33,482". |

It will be noted that in this handwritten schedule setting forth the "Building" cost valuation of $2,533,056, there is *no* mention of other depreciable items. Steinhauser insisted, however, that in the schedule "Building" included "all the equipment, fixtures, everything that was necessary to conform" to official codes. Thus, petitioner's cost evidence is rendered ambiguous by the tax return evidence, the failure to produce the testimony of an accountant, or checks and vouchers or other substantiating evidence. It was also rendered ambiguous by the evidence indicating a $3,136,500 building loan mortgage and a total first mortgage of $4,200,000. However, just as Steinhauser purported to "explain" why the tax return balanced sheet item reported the "Buildings and other fixed depreciable assets" at figures far in excess of the assessed valuation, he also attempted to "explain" the amount of the mortgages, as follows: "Q Sir, is it a fair characterization that the total mortgage on this property is secured by more than the mortgage on this property? A By at least six pieces of property, six or seven pieces of property, and our personal signatures." The bond and mortgage documents were not produced, however. Further, as noted, the record does not show that Steinhauser was an attorney or otherwise competent to explain the contents and meaning of the bonds and mortgages. The city's real estate appraiser (Anthony Fasanella) reasoned that "[a] property such as the subject is usually leased to an operator who pays all of the expenses, including the real estate taxes, and in addition, pays a net rental to the owner." Fasanella took into consideration the per bed rentals paid by three alleged comparables, derived an estimated net rent per annum for the subject property, applied an over-all capitalization rate and concluded that for the years 1975/1976-1978/1979 the estimated property value was $4,510,000. He deducted his land valuation of $205,000 to derive a "Resultant Improvement Value" of $4,305,000. Since the structure was not ready for occupancy until April 15, 1974, he applied a discount to derive a total property value for 1974/1975 of $4,040,000. Thus, in contrast to the $915,000 valuation (Building $680,000, Land $235,000) placed on the property by petitioner's appraiser, the record contained: (1) Petitioner's own written statement to the Internal Revenue Service that the 1974 cost of the *building* was $2,533,056; (2) Mortgage data showing that petitioner had obtained a building loan mortgage of $3,136,500; (3) The appraisal of the city's expert valuing the improved property at more than $4,000,000, including a building valuation of $3,874,000 for 1974/1975 and $4,305,000 for 1975/1976-1978/1979. Special Term — citing ample authority — correctly reasoned that: ordinarily, where the subject improvement is neither a "specialty" nor "prestige" building, the economic

approach, such as that used by the city, is the proper test for determining value; if, however, the value arrived at by this method exceeds the reproduction less depreciation value, the latter remains the maximum value at which the property may be assessed; in determining the reproduction costs less depreciation, the actual cost of construction is a highly significant factor particularly where (as at bar) the construction is close in time to the tax years under review; that while the testimony of petitioner's expert (a real estate appraiser — not an architect, engineer or builder) carries no probative weight as *to reproduction* costs or depreciation rate, he may nevertheless offer an opinion based on information from other persons or sources which the court may accept as some evidence of value. Special Term stated that "To the extent, then that the actual costs are highly indicative of, although not equivalent to, the reproduction less depreciation value, and to the extent that these costs are significantly disparate from and lower than the assessed valuation, petitioner has supplied sufficient evidence to sustain its burden of establishing that the assessment is excessive." Special Term then confirmed the land assessment for the tax years under review, and found that the proper value for each year in issue was as follows:

| "Year | Land | Building | Total |
|---|---|---|---|
| "1974/75 | $166,000 | $800,000 | $ 966,000 |
| "1975/76 | 205,000 | 800,000 | 1,005,000 |
| "1976/77 | 205,000 | 800,000 | 1,005,000 |
| "1977/78 | 205,000 | 800,000 | 1,005,000 |
| "1978/79 | 205,000 | 800,000 | 1,005,000". |

We conclude that Special Term's reasoning was correct except for its final conclusion that petitioner had met its burden. We find that the record contains critical ambiguities as to whether petitioner's costs were in fact all inclusive, whether they included "soft costs" such as fees for engineers, architects and attorneys, and tax and interest expenses incurred during the period of construction. The ambiguities can be resolved by production of canceled checks, vouchers, receipts and further testimony, documenting that petitioner's costs were only $680,000. Similarly the mortgage evidence ambiguities require that the bond and mortgage documents themselves be produced to document and test the sweeping conclusions made by a layman as to their contents and effect. In view of the testimony and documentary cost evidence actually adduced by petitioner at trial, we do not dismiss the petitions but afford petitioner a new trial so that the ambiguities may be resolved (see *Matter of Pepsi-Cola Co. v Tax Comm. of City of N.Y.*, 19 AD2d 56). Titone, J.P., Rabin, Margett and Weinstein, JJ., concur.