■ In the Matter of LONG ISLAND FOUNDATION FOR EDUCATION AND JEWISH RESEARCH INC., Appellant, v PHILLIP MICHAEL, as Commissioner of Finance of the City of New York, et al., Respondents. — In a proceeding pursuant to CPLR article 78 to review a determination of the respondent Tax Commission, dated July 28, 1982, which denied petitioner's application for exemption from real property taxes (the application having been made on the ground that the petitioner is a charitable organization under the provisions of the Real Property Tax Law), petitioner appeals from a judgment of the Supreme Court, Queens County (Durante, J.), dated July 29, 1982, which dismissed the

proceeding. Judgment affirmed, without costs or disbursements. Petitioner bore the burden of establishing entitlement to exemption from real property taxation (*Matter of F. O. R. Holding Co. v Board of Assessors,* 45 AD2d 875, app dsmd 35 NY2d 959). In our opinion petitioner failed to meet that burden. Petitioner, the Long Island Foundation for Education and Jewish Research, Inc., was incorporated on December 6, 1973 pursuant to the Not-For-Profit Corporation Law. Its original certificate of incorporation lists its purposes. The opening paragraph of the "purpose clause" states "[t]o promote the educational, cultural and social welfare of the Jewish community in Long Island, New York, and the community in general". An amendment (dated June 29, 1978 and filed Feb. 9, 1979) to its certificate of incorporation adds the following purpose: "To establish and maintain a residential care facility for adults of either short or long term care * * * for the aged". On January 1, 1979, petitioner acquired the subject property from S. S. & K. Realty Corp., which, prior thereto, had been in use as a proprietary (for-profit) home for adults, known as Far Rockaway Manor. The deed to the property was in reality conveyed to petitioner by Marvin Steinhauser, Irwin Steinhauser and Nat Rosenwasser. These individuals were the sole stockholders of S. S. & K. Realty Corp., the business corporation which owned the property prior to delivery of the deed. These individuals were also partners in Far Rockaway Manor Associates which leased the property from S. S. & K. for the purpose of operating the proprietary (for-profit) home for adults thereon. On October 5, 1978, three months prior to the transfer of title to petitioner, the property was the subject of a tax review hearing (over-valuation trial). In that proceeding, involving the tax years 1974/1975-1978/1979, two opposing real estate experts submitted written appraisals concerning the market value of the property during the 1978/1979 tax year and for four years prior thereto. Utilizing the cost approach, S. S. & K.'s appraiser valued the property at $915,000 for each of the years under review. The city's expert in that proceeding valued the property at more than $4,045,000 for 1974/1975 and, $4,510,000 for 1975/1976-1978/1979. The city's expert's valuation was on an income-producing basis. In addition, at the hearing, Marvin Steinhauser, one of the former owners, testified that the property was in receivership. In the tax certiorari proceeding, Special Term reduced the total assessment of $1,456,000 for 1974/1975 to $966,000 and reduced the total annual assessment of $1,675,000 for 1975/1976-1978/1979 to $1,005,000. On appeal we reversed the judgment and granted a new trial for reasons not directly relevant herein (*Matter of S. S. & K. Realty Corp. v Finance Admin.,* 82 AD2d 808). As has been noted, on January 1, 1979, petitioner acquired the subject property by deed from S. S. & K. Realty Corp., a business corporation, for $8,020,962.20 in mortgage obligations. They were as follows: (1) A mortgage, dated January 13, 1978, between S. S. & K. Realty Corp. as mortgagor and Martin Zuckerbrod and Harry S. Taubenfeld (petitioner's attorneys) as mortgagees, in the principal sum of $75,000; (2) A mortgage, dated May 31, 1978, between S. S. & K. Realty Corp. as mortgagor and the Manhattan Savings Bank as mortgagee in the principal sum of $4,332,408.93; (3) A mortgage, dated July 31, 1978, between S. S. & K. Realty Corp. as mortgagor and Long Island Lighting Company as mortgagee in the principal sum of $309,003.78; and (4) A purchase money mortgage, dated December 28, 1978, between petitioner as mortgagor and the three sole stockholders of S. S. & K. Realty Corp. as mortgagees in the principal sum of $3,303,559.49. The mortgage to Manhattan Savings Bank in the principal sum of $4,332,408.93, assumed by petitioner on its purchase from S. S. & K., contained the following clause and obligation: "27. The Mortgagor agrees that the management of the facility on subject premises has been under the control of Irwin Steinhauser, Marvin Steinhauser, Nat Rosenwasser and this factor

plus the continuance of such management is a material inducement to the Mortgagee in agreeing to make this mortgage loan and the Mortgagor agrees the Mortgagee shall have the option to declare the mortgage indebtedness due and payable within 30 days after prior written notice in the event the facility on the premises ceases to be managed by and/or the management thereof is not directly and effectively controlled by the said Irwin Steinhauser, Marvin Steinhauser, Nat Rosenwasser and or the executors, administrators, legatees or devisees of any one or more of them in the event of the death of any one of them. Further, the Mortgagee shall have the option to declare the mortgage indebtedness due and payable within 30 days after prior written notice, if the aforesaid persons, without the prior written consent of the Mortgagee, sell, transfer, convey their interest in the facility to an entity not controlled directly and effectively by the aforesaid persons or the survivor or survivors of them. The Mortgagee agrees its consent to the sale, transfer or conveyance or change in management mentioned in the previous sentence will not be unreasonably withheld. Mortgagor agrees the Mortgagee shall have the right to enforce collection of the indebtedness in accordance with the terms of this mortgage including the right of foreclosure in the event of the breach of the covenants in this paragraph." Upon acquiring the property, petitioner renamed the facility the Hebrew Living Center and continued to operate it as a residential care facility for adults. On October 1, 1979, petitioner entered into a consolidated mortgage agreement with the Manhattan Savings Bank. The bank authorized and consented to the management of the facility by a specified management organization (acronym COW) but further provided: "The Mortgagor acknowledges that it has been in serious default in required payments under the mortgage indebtedness prior to the execution of the additional mortgage loan made by Mortgagee to Mortgagor simultaneously with the execution of this agreement. The Mortgagor and the Mortgagee have entered into this agreement to allow the Mortgagor time to clear the defaults and to permit management of the mortgaged property efficiently and *profitably* and Mortgagor agrees to faithfully perform the covenants of this agreement including those relating to the monetary aspects of maintenance and operating expenses." (Emphasis supplied.) The petitioner's financial statements for the year ending December 31, 1979, show income from room and board but does not show any charitable contributions. The following were listed as interest expenses:

"Financing Expenses
    "Interest - First Mortgage      436,027.78
                                    "198,213.56    634,241.34".

Respondents' answer in this article 78 proceeding asserts: "petitioner is conducted to secure to its mortgagees a distribution of any profits petitioner might realize from the operation of the property, tax-free, by treating earned profits as a deductible mortgage expense on petitioner's books." The transcript of the hearing held on June 25, 1980, before the Tax Commission, reveals that the rates petitioner then charged the residents for room and board were $436 to $550 per month; the variance between those figures depended not on economic need but whether there was single occupancy or double occupancy and the size of the room; a person relatively well off would be admitted but would not be required to pay more, the rates being "standard"; 85 to 90% of the residents receive S.S.I. benefits. With respect to that 85 to 90% the transcript states: "MR. POSTEL: [counsel for petitioner]: * * * As far as S.S.I. goes, they give a certain amount. If it is the bare minimum, then it is completely covered. If it is not, then there must be other monies coming from the individuals. MR. BLOCK [counsel to Tax Commission]: If a person comes to you and his S.S.I. payments are less than your rate scale for a room, would he be allowed — MR. POSTEL: In

some instances, if there is no other facility available, he would come in as S.S.I. rate; and if he is not able to make the other payments, the S.S.I. would cover it. The basic S.S.I. rate is $436 per month for the basic coverage, which includes all — which includes everything. There are no supplementary charges." At the hearing before the Tax Commission, Rabbi Benjamin Kamenetzsky, the president of petitioner, testified: "MR. BLOCK: Rabbi, was there any relationship between the principals in S.S. & K. Realty Corporation, and any members of the Board of Directors, any officers, or any members whatsoever, at any time in the past, current or at the time of the conveyance of the Long Island Foundation? RABBI KAMENETZSKY: None whatsoever." He also submitted an affidavit stating that: "At no time since the incorporation of the applicant (December 6, 1973) have Irwin Steinhauser, Marvin Steinhauser and Nat Rosenwasser been officers and/or directors of the FOUNDATION." Rabbi Kamenetzsky further testified, however, "RABBI KAMENETZSKY: At that point, the personal guarantees on the mortgage, I think — *I am not too familiar with the finances,* because we have a financial secretary for this; but I know that they had a personal guarantee on the original mortgage. The S & SK [*sic*], that is what I understand." (Emphasis supplied.) At the Tax Commission hearing, however, petitioner's financial secretary (who was allegedly "familiar with the finances") did not testify; neither did Irwin Steinhauser, Marvin Steinhauser or Nat Rosenwasser or any of the officers, employees or agents of petitioner (other than its counsel) testify. On July 28, 1981, the Tax Commission denied petitioner's application for exemption. The commission's decision stated in pertinent part:

| "1979/80 A.V. | Land: $205,000 | Total: $1,675,000 |
| "1980/81 A.V. | $205,000 | $1,675,000 |

"Based upon the information submitted by the applicant and contained in its exemption file, the applicant has failed to clearly show that it is organized or conducted exclusively for exempt purposes, nor is the subject property used for exempt purposes, pursuant to RPTL Sec. 421 (1) (a) *Lawrence-Smith School, Inc. v Tax Commission,* 166 Misc. 856 (Sup. Ct., 1938), *aff'd.* 255 App. Div. 762 (1st Dept., 1938), *aff'd.* 280 N.Y. 805 (1939)." Petitioner then instituted the subject article 78 proceeding. In its original decision Special Term directed a remand to respondents "for further proceedings to fully develop the record * * * and to make proper findings". On reargument, however, it dismissed the petition distinguishing the two cases on which petitioner placed principal reliance, namely: *Matter of Belle Harbor Home of Sages v Tishelman* (100 Misc 2d 911, affd 81 AD2d 886) and *Matter of Jeantet Residence for Seniors v Commissioner of Fin.* (105 Misc 2d 1080, affd 86 AD2d 671). Petitioner now argues on appeal that *Jeantet (supra)* (which also involved a vast discrepancy between the apparent fair market value and the sales price of the facility, and large mortgages) "is directly on point and controlling herein". At bar, Special Term stated, in part: "However, in *Belle Harbor, supra,* it was assumed that the operator of the residential-care facility was legitimate charity. It was not until *Marino P. Jeantet Residence for Seniors, Inc. v The Commissioner of Finance* (105 Misc 2d 1080, affd NYLJ Feb. 3, 1982, p 13, col 6), that the City attempted to deny a real property tax exemption to an allegedly charitable corporation on the ground that the mortgages it gave in purchasing the premises exceeded the fair market value of the property. In *Jeantet, supra,* the City argued that the petitioner had assumed $3,000,000 in mortgage obligations in purchasing a financially defunct home for the aged which was worth one-third of the price paid by the petitioner. The court rejected the City's argument. 'The court finds that the fact that *Jeantet* pays interest and principal to mortgagees of the subject Premises who may profit from this

payment is not relevant in denying *Jeantet* a tax exemption when the mortgagees are an INDEPENDENT ENTITY and the subject Premises were brought in what seems to be a legitimate transaction' (*Marino P. Jeantet Residence for Seniors, Inc. v The Commissioner of Finance, supra,* 1084, emphasis in original). In *Jeantet, supra,* the mortgage was not given to private individuals but to the Thrift Associations Service Corporation (TASCO), a New York corporation owned by approximately 66 New York savings and loan associations. It is clear that in *Jeantet, supra,* the court relied on the character of TASCO when it concluded that the petitioner had given the mortgages in good faith. However, the case at bar is distinguishable from *Jeantet, supra,* because here the mortgages were not given to a combination of 66 presumably reputable savings and loan associations, but to a group of private individuals. Although petitioner's president testified that there was no relationship between the shareholders of S.S. & K. and officers and directors of the foundation, he also professed to be unfamiliar with the mortgaging arrangements 'because we have a financial secretary for this.' Further evidence concerning the mortgage arrangements was not presented to the Tax Commission or to this court." We note that the Tax Commission's decision in *Jeantet* (*supra*), states that: "The property was purchased on January 23, 1978, from DHNH Realty Corp. for a consideration of $3,000,000 subject to the following mortgages: 1st — $2,225,000 — Thrift Association Service Corp @ 10%; 2nd — 50,000 — Thrift Association Service Corp. @ 10% in 18 monthly payments commencing 6/1/78 — $2,650; 3rd — 775,000 — DHNH Realty @ 8%, monthly payments of $7,500 starting 1/23/80." Although the *Jeantet* sale also involved a purchase money mortgage, at bar Special Term correctly put emphasis on the large $3,303,559.49 mortgage given by petitioner to the stockholders of the S. S. & K. seller corporation. We also note that although the first mortgagee (TASCO) in *Jeantet* was to a reputable lender — as was the Manhattan Savings Bank, at bar the latter's mortgage required continued ownership and control by S. S. & K. stockholders and officers, on pain of default, and that bank's consolidated mortgage expressly required that the facility be operated by petitioner "profitably". Finally, we find significant the absence of testimony by the former stockholders of the S. S. & K. seller corporation or by any other employee or agent other than Rabbi Kamenetzsky — who stated "I am not too familiar with the finances, because we have a financial secretary for this". Accordingly, on the facts of this case, petitioner failed to meet its burden and therefore the judgment of Special Term should be affirmed. Mollen, P. J., Gulotta, Brown and Boyers, JJ., concur.